## CUSANO v. KOTLER.

### No. 9151.

Circuit Court of Appeals, Third Circuit.

Argued Dec. 2, 1946.

Decided Jan. 7, 1947.

Maxwell E. Sparrow, of New York City (Hodes & Hodes, of Newark, N. J., on the brief), for appellant.

Luther W. Hawley, of New York City (Samuel J. Davidson, of Hoboken, N. J., and Philip S. McLean, of New York City, on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

Plaintiff sued the defendant in the District Court for the District of New Jersey for violation of his patent Number 2,312,882. The only question before that Court and before us is the validity of the patent because the defendant does not deny that if the patent is valid he has infringed it. The District Court found in favor of validity and gave judgment for plaintiff. The defendant appeals.

The subject-matter of the plaintiff's patent is a game table for playing a game more nearly like shuffleboard than any other, although it has some of the features of the once popular crokinole and carom. The standard shuffleboard is an old game, of course, and no one could claim a patent upon it now. The trouble with shuffleboard as a popular game is that it requires a space of such length as to make it unavailable in most homes and in places of public entertainment where space is limited. The plaintiff conceived the notion of combining some of the features of the shuffleboard with some of those of the billiard table and produced a game board which was short enough to go into a fair sized room without monopolizing all of the space there. The product of the patent generally measures ten feet in length, although there is nothing in the specifications to prevent its either being made larger or smaller.

The plaintiff's device has one end of the playing surface enclosed by cushions on three sides. These cushions operate as a rebounding medium, the same way as the cushions on a billiard table operate. The opposite end may be called the playing

end, and there the playing surface is surrounded by gutters in the same fashion as a shuffleboard. The scoring space is at this playing end. If this description is clear[1] it is apparent that a game like regular shuffleboard can be played except that the disc gets into the scoring area by rebound from the cushions instead of by direct application of force from the player. It is also apparent that the game board device can be used equally well to play a three cushion modification of shuffleboard comparable to a three cushion version of billiards. It is likewise clear that the plaintiff's table is equally capable of being used for tenpins, or any modification of that game, with equal appropriateness and that the games can be played either with discs or with balls. This, in summary, is a list of the technical facts. Their simplicity is a happy novelty in patent litigation.

To this it may be added that there was a showing of what seems to us, for this sort of apparatus, a pretty good record of commercial success. The defendant's imitation carries sincerity of flattery to its ultimate limit, even to the extent of calling his table "National" while the plaintiff's is called "American". Lastly, the history of the plaintiff's application in the patent office shows a modification of the original claims in an effort, successful in the eyes of the examiner, to avoid anticipation by previously granted patents in this field.

Was the trial judge right in sustaining the plaintiff's patent? He found invention. Invention is supposed to be a question of fact,[2] though the fact finding by the patent office and the trial court is seemingly not taken with compelling seriousness by appellate courts in considering patent cases.[3]

■ We think there is support for the conclusion reached by the District Court in upholding the patent. One fact is too clear to discuss: shuffleboards and billiard tables are in the public domain.[4] Defendant makes

---

[1] In case judicial terminology is insufficient to present the matter with clarity, the invention in terms of the three claims in the patent are added out of caution. The claims are:

"1. A game board comprising a substantially flat playing surface, a wall surrounding said surface, the wall at the delivery end of the board being spaced from the surface by a gutter, the portion of the game board playing surface remote from the delivery end of the board extending to the remaining portion of said wall, said last named portion of the wall having resilient cushions whereby playing elements projected from the delivery end will rebound therefrom, said playing surface having scoring areas at the delivery end of the surface.

"2. A game board comprising a substantially flat playing surface, a portion of the board at the end remote from the delivery end of the board being bounded by a wall having a resilient cushion at the edge of the board whereby weights will rebound therefrom, said board having a scoring area at the delivery end thereof, said delivery end and scoring area being bounded on two sides and the end by a gutter.

"3. A game board of the shuffle board type comprising a substantially flat playing surface having the edges at one end of the surface partially surrounded by abutting walls having rebound cushions and having a scoring section at the other and delivery end partially surrounded by a gutter."

[2] Ryan Distributing Corporation v. Caley, 3 Cir., 1945, 147 F.2d 138, at page 140 remarks that "The issue of invention is ordinarily one for the trier of facts. * * *"; Hazeltine Corporation v. General Motors Corporation, 3 Cir., 1942, 131 F.2d 34 contains a discussion of this principle at page 37. 1 Walker on Patents (Deller's ed. 1937) 115: "The question of invention is a question of fact and not of law. * * * The question is one of evidence in each case, and the issue necessarily depends upon a shifting standard, just as in cases of due care. * * * In the case of Thomson Spot Welder Co. v. Ford Motor Co., 1924, 265 U.S. 445, 447, 44 S.Ct. 533, 68 L.Ed. 1098, the court held: 'The question of whether an improvement requires mere mechanical skill or the exercise of the faculty of invention is one of fact; and, in an action at law for infringement, is to be left to the determination of the jury.'"

[3] Hanovia Chemical & Mfg. Co. v. David Buttrick Co., 1 Cir., 1942, 127 F.2d 888–890 contains a well analyzed consideration of the applicability of this question of fact rule in relation to the appellate courts.

[4] Frank G. Menke, Encyclopedia of Sports (1944) 139 and 532: "Billiards is the indoor development of the outdoor game of lawn bowls—with original rules that are quite similar to those which now govern the game of croquet, long since renamed roque. * * *"

"Shuffleboard is an offshoot of the ancient principle of lawn bowling, but in the

the plausible argument that all the plaintiff has done is to take a piece of each of these old contrivances and put them together. The two together, he says, do not make a patentable device since neither one separately would be, arguing that the whole is not greater than the sum total of its parts.[5]

The argument has its elements of persuasiveness, but we do not think it is to be applied here. We think the plaintiff's table has offered a contribution to the game playing art, and it is an art,[6] that is new and different. The facilities offered by this table are not a form of billiards and certainly, if shuffleboard, a highly modified form of shuffleboard. We cannot ask anyone to produce an entirely new kind of game for we think a few basic ideas underlie most of them.[7] But the plaintiff's inven-

---

method of play more closely resembles the game of curling on ice.

"Its history is somewhat confused. One historian has it that the game was originated in Persia in about 1700 A.D., but various writers fix its beginning in England in about the 13th Century and quote some regal edicts concerning it to authenticate the date. * * *"

[5] Huntman Stabilizer Corp. v. General Motors Corp., 3 Cir., 1944, 144 F.2d 963, at page 965 discusses the patent principle of the combination of known elements. Also see 1 Walker on Patents (Deller's Ed. 1937) 220 and at 286: "Novelty is not negatived by antiquity of parts. * * * This rule follows from the doctrine which allows patents for new combinations of old elements or ingredients. In such cases the whole is different from the sum of all its parts, much as this printed page is different from what it would be, if the same words were arranged in alphabetical order. The fact that all the elements are old is not conclusive against patentable novelty, nor does it preclude the possibility of invention in the new combination * * *, and where the patentee combines the old elements in such a way, and makes such changes as to make a successful device, as attested by its popularity with the public, the merit of novelty cannot be denied, in the presence of any doubt on this point. * * *"

[6] Jessie H. Bancroft, Games (1937) 10 and 22: "The use of games for both children and adults has a deep significance for the individual and the community through the conservation of physical, mental and moral vitality."

"In ethnology the study of the origin and distribution of games 'furnishes,' says Mr. Culin, 'the most perfect existing evidence of the underlying foundation of mythic concepts upon which so much of the fabric of our culture is built.' The most scientific work on the entire subject of games lies in this direction. As revealed by board and other implement games the element of sport does not originally inhere in a game, the procedure being a rite of magic or religion, pursued mainly as a means of divination. * * *"

[6] Encyclopædia of Religion and Ethics (Edited by James Hastings, 1914) 167: "A game is an organized occupation, undertaken by two or more persons, the primary intention of which is not utility but pleasure or pastime by means of exhibition of the skill or good fortune of the player. It proceeds according to definite rules, and sometimes necessitates special instruments or apparatus. * * * Games as thus defined are social institutions, owing their origin to the inherent restlessness of human beings and the necessity for constant use and practice in order to [sic] the development and preservation of their physical, mental and moral powers. They enter early into the life of the individual, and are of incalculable value in the training of children for the graver pursuits of adult years. * * *"

[7] Jessie H. Bancroft, Games (1937) 8 and 21: "Games may be analyzed into certain elements susceptible of classification, such as elements of formation, shown in the circle form, line form, or opposing group; other elements are found in modes of contest, as between individuals or groups; tests of strength or skill, methods of capture, as with individual touching or wrestling, or with a missile, as in ball-tag games; or the elements of concealment, or chance, or guessing, or many others. These various elements are like the notes of the scale in music, susceptible of combinations that seem illimitable in variety. * * *

"Because of this wonderful variety in combinations leading to entirely different playing values, the author has found it impossible to agree with some other students of games, that it is practicable to select a few games that contain all of the typical elements of interest. Such limitation seems no more possible than in painting, poetry, music or any other field of spontaneous imitative or creative express. * * * natural expression through games has always been, and probably always will be, infinitely varied, * * *".

" * * * Very few games are of modern invention, though the development of many to the high point of organization and skill

tion did provide for playing something different from what existed before and, therefore, he can properly be found to have invented something.[8]

■ What the plaintiff invented will not have a very startling effect on the history of the continents or the arts and sciences. Indeed, at the argument we felt reluctant to bring the authority of the judicial process into the decision of controversies between rival traders in this field. This reluctance arose out of a doubt as to whether or not Cusano's patent met the statutory requirement that an invention be "useful".[9] A study of the cases reveals that the legal significance of "useful" in the patent statute differs from the general conversational connotation of the word. Justice Story, as early as 1817, when charging a jury, commented as follows: "* * * All that the law requires is, that the invention should not be frivolous or injurious to the well-being, good policy, or sound morals of society. The word 'useful,' therefore, is incorporated into the act in contra-

distinction to mischievous or immoral. For instance, a new invention to poison people, or to promote debauchery, or to facilitate private assassination, is not a patentable invention. But if the invention steers wide of these objections, whether it be more or less useful is a circumstance very material to the interests of the patentee, but of no importance to the public. If it be not extensively useful, it will silently sink into contempt and disregard. * * *" [10] Because of the cultural and prophylactic importance of games in our social structure, and the additional relevant factor of the huge annual expenditure for recreation [11] we can properly conclude that the creation of a new game conforms to the patent requirement of being useful.[12]

■ The defendant, as is usual in patent cases, has brought to our attention a number of prior patents upon which he relies to show that the plaintiff's patent was anticipated by previous inventors. The Trial Judge made an express finding on the anticipation point, denying anticipation.[13]

---

in which we know them is very recent. * * *"

6 Encyclopædia of Religion and Ethics (Edited by James Hastings, 1914) 167: "Games may be broadly divided into three classes—games of skill, games of chance, and games of imitation. * * * Such games [of imitation] involve the germ Drama. Both in games of chance and in those of skill there is a contest. * * *"

8 At the trial Cusano testified that from April, 1942 to September, 1945 he sold 507 of his game tables. In exhibit P-1-J, of Cusano's Request for Admission under Rule 36, the defendant-appellant admitted a conditional sales contract for the sale of one of the alleged infringing tables at $382.70. These factors of commercial success may be used as evidence of invention when other relevant factors leave the question of invention in doubt. Smith v. Goodyear Dental Vulcanite Co., 1876, 93 U.S. 486, 23 L.Ed. 952; 1 Walker on Patents (Deller's Ed. 1937) 234–239.

9 Rev.Stat. § 4886 (2d Ed.1878) and amendments as set forth in 25 U.S.C.A. § 31 (1940).

10 Lowell v. Lewis, C.C.D.Mass., 1817, 15 Fed.Cas. 1018, 1019, No. 8,568. Justice Story was commenting upon the Act of February 21, 1793, 1 Stat. 318, which used the phrase "useful invention".

11 Frank G. Menke, Encyclopedia of Sports (1944) 8: "In 1938 the American

people spent four billion dollars in pursuit of their favorite sports, * * *." Of this expenditure Menke states that $190,000,-000 was devoted to a miscellaneous classification of recreation which included such games as billiards, tennis, table tennis, badminton, et cetera. In Menke's discussion of shuffleboard on page 533, he states that "The 1942 report of the National Recreation Association shows that there were 3,304 shuffleboard courts in 278 cities where the N.R.A. has representation, and that the participation of players in the single year was 3,129,123 of which about 35 per cent were girls or women."

12 Cases in accord with our application of the "useful" standard are: Monogram Mfg. Co. v. Glemby Co., Inc., et al., 2 Cir., 1943, 136 F.2d 961; Sandy MacGregor Co. et al. v. Vaco Grip Co., 6 Cir., 1924, 2 F. 2d 655; Boyce et al. v. Stewart-Warner Speedometer Corporation, 2 Cir., 1914, 220 F. 118; Faultless Rubber Co. v. Star Rubber Co., 6 Cir., 1913, 202 F. 927. 1 Walker on Patents (Deller's Ed.1937) 312 and 1945 Cumulative Supplement 107; Stedman, Patents (1939) § 77.

13 Finding of Fact No. 11 states: "Prior patents, relied upon as anticipations, disclose no game boards having the same structural design or which are capable of, or adaptable to, the purposes disclosed in the Cusano patent."

We recognize that there are some common elements in these patents and that of the plaintiff. Pool and billiards, likewise hockey and soccer, have common elements; yet no one would say that they are alike.

As stated, the six patents, cited by the appellant, have common features with Cusano's, but do not, we think, anticipate it. Discussing them in chronological order we have first the Malinowski patent, No. 497,-452 of 1893. The Cusano and Malinowski patents have the same thread of thought in their common use of the basic idea of the billiard table. Malinowski, however, did not alter the table at all. He merely provided a three sided, inclined receptacle to place upon a billiard table. Billiard balls would be propelled into this in an attempt to place them in scoring indentations in the receptacle. The Loyer patent, No. 695,572, of 1902 is remotely related to the Cusano patent in that it also adopted some elements of the billiard table design. Loyer's table, however, was designed so that a modified game of pin-ball was played with cue sticks, billiard balls and pins. The Calaluca patent, No. 1,971,295, of 1934 had a single similar feature in that it too was dedicated to modifying the billiard or pool table. Here the similarity ends, for the patent was upon an extention attachment for the purpose of converting the billiard or pool table into a miniature bowling alley. The Maxwell patent, No. 2,005,660, of 1935 is related to the Cusano patent by both tables making use of the gutter device. But on Maxwell's inclined game board one rolls balls into pockets at the far end of the table, and the gutters are "for return to the player [of the balls] when they fail to enter pockets * * *". The British patent, No. 508,270, dated 1938 resembles Cusano's patent in that discs are part of the playing equipment and rebounding sides are used. The British board is constructed so that discs may be shot into pockets around the table, not at a flat scoring area at the delivery end of the table. The Swenson patent, No. 2,155,912, of 1939 is the most recent challenge to Cusano. It presents a board upon which a modified type of shuffleboard can be played. The Swenson design, however, did not anticipate Cusano's resilient sides and scoring area upon merely a marked surface at the delivery end of the apparatus. The Swenson scoring area was not produced by pockets or a lined surface, but by stalls into which the discs must go.

We find, therefore, that the evidence sustains the District Judge's conclusion as to invention and his conclusion, likewise, as to want of anticipation. It necessarily follows that the judgment is affirmed.